**BERGER MONTAGUE PC**
Sophia M. Rios, SBN 305801
E-mail: srios@bm.net
401 B Street, Suite 2000
San Diego, CA 92101
Telephone: 619.489.0300
Facsimile: 215.875.4604

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| BARRON PAUL MILLET,<br><br>Plaintiff,<br><br>v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC.,<br><br>Defendant. | Case No.<br><br>**COMPLAINT**<br><br>(1) Violation of 15 U.S.C. § 1681e(b)<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Barron Paul Millet ("Plaintiff"), a living, breathing 76-year-old consumer, by and through his undersigned counsel, brings this Complaint against Experian Information Solutions, Inc. ("Defendant Experian" or "Experian"), for actual, statutory, and punitive damages, costs, and attorneys' fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising from Defendant's inaccurate credit reporting wherein Defendant published consumer reports to Plaintiff's potential creditors that falsely stated that he is deceased and that he does not have a credit score.

## PRELIMINARY STATEMENT

1.    This is an action for statutory, actual, and punitive damages, costs, and attorneys' fees brought pursuant to the FCRA, 15 U.S.C. §§ 1681, *et seq.* ("FCRA").

2.    The purpose of the FCRA is to require consumer reporting agencies to "adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, ***accuracy***, relevancy, and proper utilization of such information." 15 U.S.C. § 1681(b) (emphasis added). In furtherance of its underlying purposes, the FCRA sets out requirements and obligations that consumer reporting agencies must follow when consumers dispute the accuracy of the information reported in their credit reports.

3.    This case concerns Defendant's inaccurate reporting of Plaintiff as deceased and without a credit score.

4.    Accordingly, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports in violation of the FCRA, 15 U.S.C. § 1681e(b).

## INTRODUCTION

5.    The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

6.    However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In

2
COMPLAINT

1  fact, the credit bureaus acknowledge this potential for misuse and resulting damage

2  every time they sell their credit monitoring services to consumers and third parties.

3        7.      The ongoing technological advances in data processing have resulted in

4  a boon for the companies that accumulate and sell data concerning individuals' credit

5  histories and other personal information. Such companies are commonly known as

6  consumer reporting agencies ("CRAs").

7        8.      "Credit is the lifeblood of the modern American economy, and for the

8  American consumer access to credit has become inextricably tied to consumer credit

9  scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*,

10  2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

11        9.      Congress made the following findings when it enacted the FCRA in

12  1970:

13
           i.  The banking system is dependent upon fair and accurate credit
               reporting. Inaccurate credit reports directly impair the efficiency of the
14             banking system, and unfair credit reporting methods undermine the
               public confidence which is essential to the continued functioning of the
15             banking system;

16

17        ii.  An elaborate mechanism has been developed for investigating and
               evaluating the credit worthiness, credit standing, credit capacity,
18             character, and general reputation of consumers;

19
         iii.  Consumer reporting agencies have assumed a vital role in assembling
20             and evaluating consumer credit and other information on consumers;
               and
21

22

23        iv.  There is a need to ensure that consumer reporting agencies exercise their
               grave responsibilities with fairness, impartiality, and a respect for the
24             consumer's right to privacy.

25  15 U.S.C. § 1681(a)(1-4).

26

27        10.    Thus, "[t]he FCRA evinces Congress's intent that consumer reporting

28  agencies, having the opportunity to reap profits through the collection and

dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

11.    The three major national CRAs are Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and Trans Union, LLC ("Trans Union").

12.    These CRAs sell credit information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

13.    Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C.§1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

14.    The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

15.    In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681(a)(4).

16.     This action seeks actual, statutory, and punitive damages, and costs and attorneys' fees from Defendants for their willful and/or negligent violations of the FCRA, 15 U.S.C. §§ 1681, *et seq.*, as described herein.

## THE PARTIES

17.     Plaintiff Barron Paul Millet ("Plaintiff") is a natural person who resides in the City of Crystal River, County of Citrus, State of Florida, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

18.     Experian Information Solutions, Inc. ("Defendant Experian" or "Experian") is a corporation with its principal place of business located at 475 Anton Blvd, Costa Mesa, CA 92626. Experian is authorized to do business in the State of California, including in the Central District.

19.     Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allow claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Experian resides in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

22.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

23.     The purpose of the FCRA is to require consumer reporting agencies to "adopt reasonable procedures for meeting the needs of commerce for consumer credit, personal, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information…." 15 U.S.C. § 1681(b).

24.     The FCRA further requires that when preparing consumer reports a consumer reporting agency must follow "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

**Defendant Experian's Processing of Credit Information**

25.     Defendant regularly receives information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

26.     These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

27.     Defendant collects information from thousands of furnishers.

28.     The process by which Defendant receives, sorts, and stores information is largely electronic.

29.     Furnishers report credit information to Defendant through the use of coded tapes that are transmitted to Defendant on a monthly basis through software known as Metro 2.

30.     Defendant takes the credit information reported by furnishers and creates consumer credit files.

31.     Defendant maintains credit files on more than 200 million consumers.

32.     Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

**Defendant Experian's Practices Concerning**

**the Sale of Reports on "Deceased" Consumers**

33. Defendant sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

34. Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendant, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

35. Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Defendant, must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes."

36. Defendant routinely places a "deceased" notation or marking on reports when it is advised by any of its many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

37. Defendant's furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

38. Defendant does not request or require a death certificate from any of its data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

39. Defendant does not request or require any proof from any data source, which advises that a consumer is "deceased," showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

40. Defendant does not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

41.     In some cases, in order to assure accuracy, Defendant may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit file, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Defendant does not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" deceased code is furnished to it to be placed in said consumer's credit file and/or report.

42.     Defendant regularly receives the "Death Master File" from the Social Security Administration, listing by Social Security number those consumers that the government believes to be deceased. But Defendant does not cross-reference the "X" code received from data furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

43.     Defendant will only use the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

44.     Defendant does not employ any procedures at all to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

45.     Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendant does not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark in that consumer's file.

46. Even in instances where the purportedly deceased consumer communicates directly with Defendant, Defendant does not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report.

47. Once a "deceased" mark is placed upon a consumer's report, Defendant will not calculate and will not provide a credit score for that consumer.

48. Upon Defendant's selling of reports with a "deceased" mark to third parties, Defendant never calculate or provide a credit score for that consumer and instead reports that the consumer's credit score as "N/A."

49. Defendant knows that third party credit issuers require a credit score in order to process a given credit application.

50. Defendant knows that consumers without credit scores are unable to secure any credit from most credit issuers.

51. Defendant knows that living consumers are routinely turned down for credit specifically because Defendant is reporting them as "deceased" and without a credit score.

52. Defendant has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because Defendant is inaccurately reporting them as "deceased" and without a credit score.

53. Defendant has received and documented many disputes from consumers complaining that their credit report has them erroneously marked as "deceased."

54. Defendant knows that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" code, even when said consumers are not on the Death Master File and are, in fact, alive.

55. Nevertheless, Defendant does not employ any procedures to assure that a consumer marked as "deceased" on their credit report(s) is, in fact, deceased.

56.     Even consumers who dispute the erroneous "deceased" status on their credit report(s) continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

57.     Defendant does not have any independent procedure to change an erroneous deceased status on its own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

58.     Nor does Defendant employ any procedures to limit or stop the furnishing of reports to third parties for consumers that it has marked as "deceased" under any circumstances.

59.     For years after a consumer's actual death, Defendant will continue to sell credit reports about that consumer.

60.     Defendant will only remove a deceased consumer's file from its credit reporting database when it is no longer valuable to it—meaning that no one is continuing to purchase reports about that consumer.

61.     Defendant charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as it would for any other report.

62.     Defendant profits from the sale of reports on deceased consumers.

63.     Defendant has in its credit reporting database many "deceased" tradelines corresponding to distinct credit files for individual consumers that it has marked as "deceased."

64.     Defendant knows that truly deceased consumers do not apply for credit.

65.     Defendant knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Defendant to be a common and major source of identity theft.

66. Defendant knows that identity theft and credit fraud are serious and widespread problems in our society.

67. Defendant warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and requires relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

68. Defendant has no similar death certificate, executorship paper, or any other proof requirements for its data sources, which report a consumer as deceased or for the purchasers of its reports who access the purportedly deceased consumer's information.

69. Defendant sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

70. For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Defendant to sell their credit reports, absent a court order.

71. Defendant knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**Synchrony Bank Denies Plaintiff's Credit Application in February 2022**

72. In or around mid-February 2022, Plaintiff visited his local Sam's Club to renew his annual membership. While at the store that day, Plaintiff decided to apply for a Sam's Club credit card, provided by Synchrony Bank ("Synchrony"), in order to obtain extra savings on his future Sam's Club purchases.

73. Plaintiff submitted a credit application to Synchrony for a Sam's Club credit card via a Sam's Club employee. As part of his credit application, Plaintiff

provided Synchrony with his personal identification information, including his Social Security number, and authorized it to obtain his credit reports.

74. On or about February 20, 2022, Synchrony purchased a copy of Plaintiff's credit report and credit score from Experian in order to determine whether Plaintiff qualified financially for the credit that he sought.

75. Shortly thereafter, Plaintiff's application for a Sam's Club credit card was denied.

76. The Sam's Club employee informed Plaintiff of the same but was unable to provide Plaintiff with any additional information. The employee informed Plaintiff that he would receive a letter in the mail with an explanation regarding the reason(s) his application was denied.

77. Several days afterwards, Plaintiff received written correspondence from Synchrony informing him that his credit application had been denied because "Credit bureau reports applicant is deceased." Synchrony's correspondence specifically informed Plaintiff that its credit determination was based on the contents of his credit report as reported by Experian.

78. Synchrony denied Plaintiff's credit application because Experian reported Plaintiff as "deceased" and without a credit score.

79. The credit report that Experian provided to Synchrony regarding Plaintiff was grossly inaccurate: Plaintiff is not deceased and has a credit score.

80. By reporting Plaintiff as "deceased" and without a credit score to Synchrony, despite the fact that Plaintiff is alive and has a credit score, Defendant Experian failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit report, in violation of 15 U.S.C. § 1681e(b).

**Synchrony Bank Denies Plaintiff's Credit Application**

**for a Second Time in March 2022**

81.     Shortly thereafter, confused, worried, and anxious after discovering Experian's inaccurate reporting, Plaintiff called Synchrony Bank to find out more information about the deceased reporting.

82.     At the time Plaintiff received the letter from Synchrony informing him that Experian reported him as deceased, he had two (2) active credit accounts with Synchrony. The Synchrony employee he spoke with that day informed him that there was nothing in Synchrony's system indicating that he is deceased.

83.     A few days later, in or about early March 2022, thinking that perhaps his denial had simply been due to a clerical error, Plaintiff submitted another credit application to Synchrony for a Sam's Club credit card, directly through the Sam's Club website. As part of his credit application, Plaintiff again provided Synchrony with his personal identification information, including his Social Security number, and authorized it to obtain his credit reports.

84.     Plaintiff's application was denied for a second time. The denial directed him to a webpage that once again informed him that he would receive a letter from Synchrony explaining the reason(s) for the denial of his credit application.

85.     On or about March 2, 2022, Plaintiff received an email from Synchrony informing him that his credit application had been denied because "Prior application submitted too recently."

86.     Defendant Experian's grossly inaccurate reporting of Plaintiff as deceased and without a credit score when he is alive and has a credit score, which directly led Plaintiff to apply for a Sam's Club credit card multiple times, ultimately caused Plaintiff to be again denied the credit he sought and otherwise qualified for.

87.     As a result of Defendant Experian's conduct, action, and inaction, Plaintiff has suffered a range of actual damages including, without limitation, being denied credit for a Sam's Club credit card issued by Synchrony Bank on at least two

(2) occasions; loss of credit; loss of the ability to purchase and benefit from his good name and credit rating; detriment to his credit rating; out-of-pocket loss; and emotional distress, including but not limited to; stress; anxiety; loss of sleep; and the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and being falsely reported as "deceased."

88.    At all times pertinent hereto, Defendant Experian was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of Defendant Experian herein.

89.    At all times pertinent hereto, the conduct of Defendant Experian, as well as that of its agents, servants, and/or employees, was intentional, willful, reckless, and in negligent disregard for federal law and Plaintiff's rights.

**CLAIMS FOR RELIEF**
**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**

90.    Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-89 as if fully stated herein.

91.    The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

92.    On at least one occasion, Defendant Experian prepared and published a patently false consumer report regarding Plaintiff.

93.    Despite actual and implied knowledge that Plaintiff is not dead, Defendant Experian readily sold and prepared such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

14
COMPLAINT

1    94.    Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to
2  establish or to follow reasonable procedures to assure maximum possible accuracy
3  of the contents of the credit reports it published and maintains concerning Plaintiff.

4    95.    As a result of Defendant Experian's conduct, action, and inaction,
5  Plaintiff has suffered a range of actual damages including, without limitation, being
6  denied credit for a Sam's Club credit card on at least two (2) occasions; loss of credit;
7  loss of the ability to purchase and benefit from his good name and credit rating;
8  detriment to his credit rating; out-of-pocket loss; and emotional distress, including,
9  but not limited to, stress; anxiety; loss of sleep; and the mental and emotional pain,
10 anguish, humiliation, and embarrassment of credit denials and being falsely reported
11 as "deceased."

12   96.    Defendant Experian's conduct, action, and inaction was willful,
13 rendering it liable for actual or statutory damages, and punitive damages in an amount
14 to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, they
15 were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

16   97.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant
17 Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n
18 and/or § 1681o.

19                            **PRAYER FOR RELIEF**

20       WHEREFORE, Plaintiff prays for relief as follows:

21   a)    Determining that Defendant negligently and/or willfully violated the
22         FCRA;

23   b)    Awarding Plaintiff actual damages, statutory, and punitive damages as
24         provided by the FCRA;

25   c)    Awarding Plaintiff reasonable attorneys' fees and costs from Defendant
26         as provided by the FCRA; and

27   d)    Granting further relief, in law or equity, as this Court may deem
28         appropriate and just.

## DEMAND FOR JURY TRIAL

98.    Plaintiff demands a trial by jury.


Respectfully submitted,

**BERGER MONTAGUE PC**

Dated: February 19, 2024        */s/ Sophia M. Rios*
                               Sophia M. Rios, SBN 305801
                               Email: srios@bm.net
                               401 B Street, Suite 2000
                               San Diego, CA 92101
                               Telephone: (619) 489-0300
                               Facsimile: (215) 875-4604


                               Bryan L. Plaster, MN Bar No. 0402792*
                               Email: bplaster@bm.net
                               **BERGER MONTAGUE PC**
                               1229 Tyler Street NE, Suite 205
                               Minneapolis, MN 55413
                               Telephone: (651) 728-5423
                               Facsimile: (612) 584-4470
                               **Pro hac vice to be requested*

                               *Counsel for Plaintiff*